Samuel Richard Rubin
FEDERAL PUBLIC DEFENDER
Nicole Owens
Assistant Federal Defender
FEDERAL DEFENDER SERVICES OF IDAHO
702 W. Idaho, Ste. 1000
Boise, Idaho 83702
Telephone:  (208) 331-5500
Facsimile:   (208) 331-5525

Attorneys for Defendant
JEREMY DALE SORTOR

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO
(HONORABLE B. LYNN WINMILL)

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | CR19-226-S-BLW |
| ) | |
| Plaintiff, ) | Expedited Motion to Revoke |
| ) | Detention Order |
| vs. ) | |
| ) | |
| JEREMY DALE SORTOR, ) | |
| ) | |
| Defendant. ) | |
| ) | |

## Introduction

Circumstances in the United States have radically changed since Mr. Sortor was detained on August 8, 2019. (ECF No. 13 & 14.)  Since that date, COVID-19 has emerged as a global and national health emergency. COVID-19 poses a clear and present danger to Mr. Sortor and to the community. It appears to be as much as 35x deadlier than the flu. It kills the elderly and the

ill at terrifyingly high rates. And jail and detention facilities are going to be hotbeds of this disease; infections, begun in jail, will spread into the community more broadly, ultimately taking lives.

Mr. Sortor has come before the Court to be sentenced on three (3) occasions. (ECF No. 30, 37 and 41.)  Each time, his sentencing has been continued.  Importantly, he plans to ask the Court for a sentence of time served when he is eventually sentenced.  As detailed in the many letters of support, he has a positive plan once he is released from custody. (ECF No. 28.)  This plan is also his plan if he is released pending his sentencing now.

Right now, both Mr. Sortor's own life and the safety of the community will best be protected by his release. The emerging consensus among public health experts is that it is absolutely critical to reduce incarceration in order to contain the spread of this virus. *See* Exhibit A, Beyrer Dec. ¶ 15. It is equally critical for Mr. Sortor's own safety. He respectfully asks for release.

### A. Inmates Are At High Risk Of Infection Because COVID-19 Is Highly Contagious And Detention Facilities Are Associate With High Transmission Of Infectious Diseases

As an inmate Mr. Sortor could not be in a worse position to follow the BDB's advice for protecting himself from COVID-19.  Detention facilities, which confine persons in close proximity with shared ventilation and facilities, are ill equipped to prevent the virus's transmission.  Incarceration poses a ***grave public health threat*** during this crisis. "COVID-19 poses a serious

risk to inmates and workers in detention facilities." Beyrer Dec. ¶ 11. It is well-known in the epidemiological community that such facilities are "associated with high transmission probabilities for infectious diseases." Beyrer Dec. ¶ 11; *see also* Joseph A. Bick (2007). Infection Control in Jails and Prisons. *Clinical Infectious Diseases* 45(8):1047-1055, *at* https://doi.org/10.1086/521910; Laura M. Maruschak et al. (2015). Medical Problems of State and Federal Prisoners and Jail Inmates, 2011-12. NCJ 248491. Washington, D.C.: U.S. Department of Justice, Bureau of Justice Statistics, *at* https://www.bjs.gov/content/pub/pdf/mpsfpji1112.pdf.

In recognition that COVID-19 has spread quickly among high concentrations of people in close proximity, the Treasure Valley has shut down schools, evicted college students home from dorms, closed restaurants, and ordered conferences rescheduled. On March 13, 2020, this Court prohibited anyone who had been in the Seattle-Tacoma area from entering the courthouse for fourteen days and the SeaTac FDC ceased allowing attorney visits. Exhibit B, Court Email: Information Regarding Coronavirus Disease (COVID-19) and Court Operations, March 13, 2020; Exhibit C.

When outbreaks occur in prisons, this leads directly to increased spread beyond the confines of jail. *See* Beyrer Dec. ¶ 12. "It is therefore an **urgent priority** in this time of national public health emergency to reduce the number of persons in detention as quickly as possible." Beyrer Dec. ¶ 17 (emphasis

added). Indeed, the U.S. House of Representatives Committee on the Judiciary is monitoring this situation closely and is concerned. Exhibit D. They express there is an "urgency of taking action to prevent more avoidable deaths of individuals in federal custody." Exhibit D.

COVID-19 is coming to our prisons. It's not a question of if, but when. COVID-19 has already appeared in multiple prisons in China. *See* Beyrer Dec. ¶ 15. There is at least one case of it in a New York jail. There has been one death in BOP custody. Exhibit D. The local jails in this district have not, to date, taken any precautionary measures that counsel is aware of to stem the spread of this virus, as they are still accepting new arrests.

The ramifications of COVID-19 for both the incarcerated population and correctional staff are dire. "Infections that are transmitted through droplets, like influenza and SARS-nCoV-2 virus, are particularly difficult to control in detention facilities." Beyrer Dec. ¶ 13. Social distancing and decontaminating surfaces is "virtually impossible." *Id*. Furthermore, "[t]he high rate of turnover and population mixing of staff and detainees increases likelihoods of exposure." *Id.*

U.S. Detention Facilities already have a track record of mismanaging infectious diseases, *see id.*, and the fact that it remains business as usual in our jails is highly troubling. At this moment in our national history there can be no doubt: "[r]eleasing as many inmates as possible is important to protect

the health of inmates, the health of correctional facility staff, the health of health care workers at jails and other detention facilities, and the health of the community as a whole." Beyrer Dec. ¶ 19.

Indeed, the Ninth Circuit understands the danger of keeping individuals in custody during this time. They have "sua sponte" ordered at least one individual be released from custody in an immigration case because "of the rapidly escalating public health crisis, which public health authorities predict will especially impact immigration detention centers." *Xochihua-Jaimes v. Barr*, No. 18-71460 (9th Cir. March 23, 2020) (attached as Exhibit E). Prisons and immigration detention centers share the same characteristics of close proximity that make it especially dangerous for people to remain in custody.

**B. The Bail Reform Act empowers the Court to release Mr. Sortor for COVID-19-related reasons**

"In our society, liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *United States v. Salerno*, 481 U.S. 739, 755 (1987). Earlier on in this case, the magistrate court ordered Mr. Sortor detained. Since that time, circumstances have radically changed. Now, his continued incarceration poses a grave danger to both 1) Mr. Sortor and 2) the community.

Mr. Sortor's continued detention poses a grave risk to the community. The more people remain detained in detention facilities, the greater the

likelihood of an unchecked outbreak of COVID-19 within our detention facilities and jails. *See* Beyrer Dec. ¶ 11. Such an outbreak will impact inmates, correctional officers, and the communities of which those inmates and officers are a part. Additionally, if Mr. Sortor falls ill, he will consume precious resources that are needed to contain this pandemic. If he remains detained in his detention will pose a risk not only to herself, but also to the community.

Despite the Bail Reform Act's promise, federal courts rely on pretrial detention at an alarmingly high rate. *Salerno* says that release should be the "norm," yet federal district courts routinely detain defendants more often than they release them. Between 1995 and 2010, the number of federal criminal defendants detained pretrial jumped by 184%. *See* U.S. Dep't of Justice, Office of Justice Programs, *Pretrial Detention and Misconduct in Federal District Courts, 1995-2010* (2013), available at https://www.bjs.gov/content/pub/pdf/pdmfdc9510.pdf. And folks on pretrial release commit crimes and fail to appear at strikingly low rates – hovering around 1% and 2%. *See id.*

These numbers show that federal district courts historically err on the side of caution when they make release determinations. They *over-detain* relative to the requirement that all "doubts regarding the propriety of release should be resolved in the defendant's favor." *United States v. Gebro*, 948 F.2d 1118, 1121 (9th Cir. 1991) (citations omitted).

Like so much else that has had to change so quickly during these times, public health demands that this instinct change. We are now in a situation where incarceration poses a grave public threat, such that we must be prepared to accept the risk of pretrial release in order to protect our communities from the dangers posed by concentrated populations and community spread. The epidemiological community speaks with one voice on this point:

- Dr. Beyrer from Johns Hopkins University: "Releasing as many inmates as possible is important to protect the health of inmates, the health of correctional facility staff, the health of health care workers at jails and other detention facilities, and the health of the community as a whole." Beyrer Dec. ¶ 19.
- Dr. Greifinger: "Even with the best-laid plans to address the spread of COVID-19 in detention facilities, the release of high-risk individuals is a key part of a risk mitigation strategy. In my opinion, the public health recommendation is to release high-risk people from detention[.]" Greifinger Dec. ¶ 13.
- Dr. Stern: "As a correctional public health expert, I recommend the release of eligible individuals from detention, with priority given to the elderly and those with underlying medical conditions most vulnerable to serious illness or death if infected with COVID-19." Stern Dec. ¶ 11.
- Dr. Meyer, an Assistant Professor of Medicine at Yale School of Medicine: "Reducing the size of the population in jails and prisons can be crucially important to reducing the level of risk both for those within those facilities and for the community at large." Meyer Dec. ¶ 37.

Unless our detention practices change significantly, people will die.

### C. Strict conditions will protect the public from Mr. Sortor

Importantly strict conditions of release are available for Mr. Sortor's supervision. He will be supervised by Pretrial Services and can be placed on ankle monitoring and home arrest. Since 2009, Pretrial Services' data has

found that only 2.9% of defendants in the highest risk category were re-arrested for a violent crime while on release. Thomas H. Cohen, Christopher T. Lowenkamp, and William E. Hicks, *Revalidating the Federal Pretrial Risk Assessment Instrument (PTRA): A Research Summary* (September 2018) *at* https://www.uscourts.gov/sites/default/files/82_2_3_0.pdf.

Importantly, Mr. Sortor was doing well on supervision prior to his detention in this case. The unlawful possession of the firearms occurred on August 14, 2018. At that time, Mr. Sortor was on supervision for a state court case. A probation violation was filed in that case on August 16, 2018. That case was settled by a plea agreement that resulted in Mr. Sortor being placed back on probation on November 1, 2018. Over eight (8) months later, the Indictment in this case was filed (ECF No. 1.) During that time, Mr. Sortor was successfully supervised in the community without incident.

Once Mr. Sortor was arrested on the Indictment in this case, a new probation violation was filed in his state case. The sole allegation was committing this new federal crime. That prosecutor in that case has now moved to dismiss the probation violation. (Exhibit F.)

Mr. Sortor has submitted evidence whereby his possession of the firearms was for lawful sporting purposes. With that adjustment his total offense level would be six (6) which leads to a guideline imprisonment range of four (4) to ten (10) months. Thus, even if the Court were to sentence him at

the high end of this guideline range, by May 11, 2020, he will have served over ten (10) months.

Accordingly, Mr. Sortor respectfully asks for release on strict conditions, including ankle monitoring and home detention. This is the only way to promote public health, protect Mr. Sortor, and ensure that his constitutional rights are respected during this emergency.

Prior to filing this motion, undersigned counsel sought the position of the government and pre-trial services. As of the time of the filing of motion, no response had been received.

## Conclusion

For the reasons stated here, Mr. Sortor must be released.

Respectfully submitted this 30th day of March, 2020.

SAMUEL RICHARD RUBIN
FEDERAL PUBLIC DEFENDER
By:

/s/ Nicole Owens
Nicole Owens
Assistant Federal Defender
Federal Defender Services of Idaho
Attorneys for Defendant
Jeremy Dale Sortor

## CERTIFICATE OF SERVICE

I CERTIFY that I am an employee of the Federal Defender Services of Idaho, and that a copy of the foregoing document was served on all parties named below on this 30th day of March, 2020.

Kate Horwitz, Assistant United States Attorney
Office of the United States Attorney              ____United States Mail
1290 West Myrtle Street, Suite 500                ____Hand Delivery
Boise, ID 83702                                   ____Facsimile Transmission
(208) 334-1211                                    _X_ CM/ECF Filing
(208) 334-1413 – Facsimile                        ____Email Transmission
Kate.Horwitz@usdoj.gov

Dated: March 30, 2020            /s/ Joy Fish
                                 Joy Fish